IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC PARK, | ) | CASE NO. 5:12-cv-00370 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Eric Park ("Plaintiff" or "Park") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying his applications for
social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. §
405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and
Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's
decision be **AFFIRMED**.

## I.  Procedural History

On June 8, 2007, Park filed applications for Disability Insurance Benefits and
Supplemental Social Security Income.  Tr. 80-83.  He alleged disability as of November 1, 2006
(Tr. 108, 111, 122, 126), due to depression, anxiety, disc problems and arthritis, nerve damage
and a bone spur in his back (Tr. 84, 87, 93, 96, 122).   After initial denial by the state agency (Tr.

80-81, 84-89) and denial upon reconsideration (Tr. 82-83, 93-98), Park requested a hearing (Tr. 99), and an administrative hearing was held before Administrative Law Judge Peter R. Bronson ("ALJ") on April 12, 2010.  Tr. 37-79.

In his June 3, 2011, decision (Tr. 7-36) the ALJ determined that Park had not been under a disability from November 1, 2006, through the date of the ALJ's decision.  Tr. 7-36.  Park requested review of the ALJ's decision by the Appeals Council (Tr. 6, 167-169) and, on December 23, 2011, the Appeals Council denied Park's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal and Vocational Evidence

Park was born on May 18, 1967.  Tr. 40, 108, 111.  He is a high school graduate.  Tr. 40. He has a minor son (Tr. 40) and is unmarried (Tr. 44).  He lives in an apartment.  Tr. 43.  Also, through his work at Little Tykes, he received additional training in and obtained a certificate for heavy equipment operation.  Tr. 40, 132, 167.   He last worked in 2006/2007.  Tr. 41-42, 63-64. His past employment includes work as an injection molding operator, laborer and heavy equipment operator, and heavy glass installer.  Tr. 63-64.

### B.    Medical Evidence[1]

#### 1.    Treating physicians

Plaintiff received treatment at Falls Family Practice for his back and other conditions.  Tr. 171-195.  Plaintiff's 2006 Falls Family Practice treatment records reflect ongoing back problems including a herniated disc at the L4 and L5 levels (Tr. 194).  Tr. 171-195.  Plaintiff previously received epidural injections and did not want surgery.  Tr. 194.  On June 1, 2006, Plaintiff

---

[1] Because Park has stated that his lower back condition is the focus of the case (Doc. 14, p. 2), the medical evidence summarized herein is related to his back condition.

complained of severe back pain.  Tr. 185.   Treatment notes from that visit reflect that Plaintiff's activity level was above average and he exercised daily.  Tr. 185-186.  On August 1, 2006, Plaintiff's physician noted that Plaintiff wanted more medication than he was comfortable giving Plaintiff and that he would need to go to pain management.[2]  Tr. 180-181.  On August 18, 2006, Plaintiff's physician agreed to write a re-fill for Vicodin but advised Plaintiff that he needed to set an appointment for pain management and also urged him to continue stretching.  Tr. 178-179.

Plaintiff had an initial pain management visit with Dr. Robert Geiger, M.D., of the Falls Pain Management Center on December 7, 2006.  Tr. 212-214.  Plaintiff reported having had low back pain with radiation into his bilateral buttocks for approximately 10 years with the pain getting progressively worse.  Tr. 212.  Dr. Geiger noted that a July 30, 2006, x-ray showed arthritic changes of the lumbar spine with disc space narrowing at L5-S1.  Tr. 212.  Plaintiff reported that he had received chiropractic treatments in the past and had a surgical evaluation many years prior.  Tr. 212.  Park rated his pain level at an 8 and indicated that the best it gets is a level 5 and the worst it gets is a level 10.  Tr. 212.  Park advised Dr. Geiger that he was missing work about 1 day per month and it was getting to the point where his pain was affecting his whole life.  Tr. 212.  He reported that stretching and medication helped relieve some of the pain. Tr. 212.  The physical exam on December 7, 2006, revealed that Park: could raise out of a seated position without difficulty or complaints of pain; walked with a normal gait; had excellent flexibility of the lumbar spine; had no pain to palpation of the spinous processes of his lumbar spine; had excellent strength bilaterally; had some mild pain with facet loading maneuvers, especially lateral bending to the left; and had some mild pain to palpation into the right sciatic notch.  Tr. 213.  Dr. Geiger diagnosed Plaintiff with probable degenerative disc disease, facet

---

[2] At later pain management visits, in 2007, treatment records note that Plaintiff was not displaying aberrant drug seeking behavior.  Tr. 202, 207.

syndrome and lumbrosacral radiculitis and recommended that Park consider caudal injections or facet injections.  Tr. 213-214.  Dr. Geiger stressed that Park must stay on schedule with his medications and he cannot over-medicate.  Tr. 214.

Park was seen again on February 22, 2007, and reported that overall he thought his pain was moderately well controlled with his analgesic regimen.  Tr. 206.  He noted that he was considering surgery but his lack of health insurance made that complicated.  Tr. 206.  Dr. Geiger recommended an EMG/NCT ("nerve conduction test") of Park's lower extremities to further investigate the cause of his radicular-like pain and he adjusted some of Park's medications.  Tr. 206-207.

On March 23, 2007, the EMG/NCT test was completed.  Tr. 373.  The test was consistent with chronic left L5-S1 root lesion.  Tr. 373.  The changes appeared remote with only minimal active denervation and membrane instability noted in the medial gastrocnemius.  Tr. 373.

Following the nerve conduction test, on March 29, 2007, Plaintiff saw Dr. Geiger.  Tr. 204-205.  Park was present at the visit with his girlfriend to discuss whether he was a candidate for disability.  Tr. 204.   On physical examination, Plaintiff had a normal gait, good balance, good flexibility and good range of motion.  Tr. 205.  Plaintiff was mildly positive for facet loading maneuvers with pain radiating into his left buttock region and pain with deep palpation in the left sciatic notch.  Tr. 205.  Plaintiff's progress was stable and Park felt that he had adequate analgesia.  Tr. 205.  Dr. Geiger reviewed the results of the EMG/NCT.  Tr. 205.  He advised Park that he did not believe Park was a candidate for disability and encouraged Park to seek involvement in a retraining program so that he could find a job that did not involve construction.  Tr. 205.  In response to Plaintiff seeking a "miracle pill" to make him pain free,

Dr. Geiger explained that pain medications are not 100%, but are just to take the edge off so that Park can remain active.  Tr. 204-205.

On May 1, 2007, Plaintiff saw Dr. Geiger again with continuing complaints of back pain radiating into his buttocks and legs.  Tr. 201.  He still had no insurance and was paying out-of-pocket for medication which was difficult.  Tr. 201.  He reported that the Oxycodone was causing fatigue and constipation and was upsetting his GI.  Tr. 201.  In response to Park's statements that he wanted to go back to work to make money and obtain health insurance but did not feel he could with the side effects he was having from the Oxycodone, Dr. Geiger discontinued the Oxycodone and prescribed Norco because Plaintiff stated he can take Norco and work safely with heavy equipment.  Tr. 201-202. On physical examination, Plaintiff had quite a bit of tenderness to palpation through his lower lumbosacral area, particularly over his sacroiliac joints, but he had good lower extremity strength.  Tr. 202.  His progress remained stable and he was able to perform his activities of daily living.  Tr. 202.

Plaintiff's next pain management visit was on August 17, 2007.  Tr. 272-274.  Plaintiff reported continuing pain and that he felt he was becoming tolerant to Norco.  Tr. 272.  Dr. Geiger discontinued the Norco and adjusted his medications.  Tr. 273-274.  Because Plaintiff was continuing to have difficulty paying for his medication, Dr. Geiger gave Park a coupon so he could try Lyrica free of cost and Dr. Geiger provided Park samples of Zanaflex.  Tr. 273-274.  Plaintiff reported that he was applying for disability.  Tr. 272.

During an October 24, 2007, visit, Plaintiff reported that he was trying to increase his activity and was trying to get some part-time work for income.  Tr. 269.  He had not used the free coupon for the Lyrica prescription.  Tr. 269.  Dr. Geiger reminded him that he was to try Lyrica with the free coupon and, if he tolerated the medicine, they would complete the patient

assistance form.  Tr. 269.  Plaintiff had moderate tenderness midline at the L5-S1 region but overall his physical examination was unremarkable.  Tr. 270.

On January 8, 2008, Plaintiff saw Dr. Jim P. Bressi, D.O., at the pain management clinic. Tr. 267-268.  Plaintiff reported that he was continuing to have significant pain throughout the day and that the pain was worse in his legs.  Tr. 267.  Plaintiff was not approved for assistance for the Lyrica.  Tr. 267.  However, Plaintiff reported that he tried Lyrica for one week but did not notice any change in his leg pain.  Tr. 267.  Park reported that he was going to be going back to work the following week and that he was anticipating increased pain as a result.  Tr. 267.  Other than mild complaints of pain with facet loading maneuvers with radiating pain into his buttock region and some mild hypertonicity of the lumbar paraspinal muscles, Plaintiff's physical examination was unremarkable.  Tr. 268.  Dr. Bressi recommended that Plaintiff continue with his current medications and that he try a new medication, Pamelor, at nighttime.  Tr. 268.

During a May 14, 2008, appointment, Dr. Geiger advised Plaintiff that he did not want to increase Plaintiff's medications because of Park's young age and his already significant amount of opioid use at the time and because his disease was only mild on the x-ray.  Tr. 397.

During an August 20, 2008, appointment with Dr. Geiger, Plaintiff reported having gone back to work because of child support obligations but noted that the work was labor intensive and difficult.  Tr. 393-395.  Plaintiff requested an increase in Oxycodone, but Dr. Geiger would not increase the dosage.  Tr. 393-395.  Dr. Geiger noted that they would obtain information for Plaintiff regarding the Bureau of Vocational Rehab so that he could possibly obtain job training for some other type of work that would be less physically demanding.  Tr. 295.  During a November 18, 2008, visit with Dr. Bressi, Plaintiff reported that he had been doing a great deal of heavy labor.  Tr. 391.  Because Plaintiff reported that certain medications were not helping,

Dr. Bressi adjusted Plaintiff's medication.  Tr. 391.  Again, during a March 3, 2009, visit with

Dr. Bressi, Plaintiff reported that he had been working for Stow Glass and had been lifting a lot

up and down stairs.  Tr. 387.  As a result, Plaintiff reported increased pain in his back.  Tr. 387.

Dr. Bressi made some adjustments to Plaintiff's medications.  Tr. 389.

       During a July 10, 2009, visit, Plaintiff reported working full-time as a salesman.  Tr. 385.

Because the Methadone was causing significant dizziness, Dr. Bressi discontinued that

medication.  Tr. 386.

       On August 17, 2009, Plaintiff received emergency room treatment for complaints of leg

and back pain.  Tr. 310.  Plaintiff was given an anti-inflammatory injection and he was

discharged in stable condition.  Tr. 312-313.

       On September 2, 2009, Plaintiff saw Dr. Bressi and reported that he had been vomiting

frequently, which he believed was because of the medication.  Tr. 382.  He reported that, after he

vomited, he would take more medication because he was unsure how much medication he

actually took.  Tr. 382.  He could not explain why he was taking more of the medication that he

felt was making him sick.  Tr. 382.  Dr. Bressi recommended weaning Plaintiff off the

Oxycodone and prescribed medication to start that weaning process.  Tr. 384.

       On September 9, 2009, Plaintiff was seen by Dr. Leroy Lefever, D.O., of the Falls Pain

Management Center.  Tr. 375-377.  A joint adjustment was performed and prescriptions for

Klonopin and a muscle relaxer were given to Plaintiff.  Tr.  375, 378.  Following that visit,

Plaintiff thought the adjustment was out of line and, on that same day, Plaintiff went to the

Summa Western Reserve Hospital for emergency room treatment.  Tr. 293.  His physical

examination was generally unremarkable.  Tr. 293.  The ER physician consulted with Dr. Bressi,

prescribed some additional pain medication and advised Plaintiff to see Dr. Bressi for follow-up

evaluation.  Tr. 293.   Plaintiff followed up with Dr. Bressi on September 10, 2009.  Tr. 379-381.

Plaintiff reported that he was working full-time.  Tr. 379.  He did not report any side effects from

the medication.  He was ordered to continue with the current dosage of Oxycodone and was also

given a Medrol Dosepak.  Tr. 381.

On October 3, 2009, Plaintiff saw Dr. T. Maxfield, D.O., for a pain management consult.

Tr. 280-281.  Plaintiff saw Dr. Maxfield because he knew him from when Dr. Maxfield was a

resident and Plaintiff owed a lot of money to the pain management clinic and was not sure

whether he would be seen there again.  Tr. 280.  Dr. Maxfield advised Plaintiff that he was not a

chronic pain management specialist but he would try to get Plaintiff covered for about a month

or more until he could find someone else to see.  Tr. 280.   Dr. Maxfield prescribed some

medication and saw Plaintiff again on October 21, 2009.  Tr. 280, 282.  Plaintiff informed Dr.

Maxfield that he was allergic to the Percocet and therefore did not take the medication.  Tr. 282.

Dr. Maxfield prescribed Hydrocodone/Ibuprofen instead.  Tr. 282.  He also wrote a referral for

General Hospital Ortho Clinic.  Tr. 282.

On November 2, 2009, Plaintiff was seen by Dr. D. Harley of the North Hill Family

Practice for his back pain.  Tr. 283-285.  Thereafter, on November 4, 2009, and on November 17,

2009, he was seen at the Summa Western Reserve Hospital for his back pain.  Tr. 287, 290.

Plaintiff was prescribed additional medications on both occasions.  Tr. 288, 291.

On November 27, 2009, Plaintiff was seen by the Aultman Center for Pain Management.

Tr. 368.  Plaintiff described his pain as continuous, aching, pins and needles, stabbing, shooting,

burning, miserable and unbearable.  Tr. 368.  Dr. Robert M. Felden, D.O., FAOCA, provided

Plaintiff with a pain medication plan and advised Plaintiff that they would obtain information

from Dr. Bressi and see Plaintiff for a follow up.  Tr. 369-370.  On January 6, 2010, Plaintiff saw

8

Dr. Felden again.  Tr. 366-367.  Park reported that he was getting some improvement from the current medication regimen and reported no side effects.  Tr. 366.  Dr. Felden discussed a right sacroiliac joint injection but, because Plaintiff was without insurance, Plaintiff did not wish to pursue the injection.  Tr. 366.  Dr. Felden adjusted Plaintiff's medication slightly and advised Plaintiff to follow up regarding the injection if he obtained insurance.  Tr. 367.

### 2.    State agency reviewing physician

On November 13, 2007, Dr. Walter Holbrook, M.D., completed a Physical RFC Assessment.[3]  Tr. 236-243.  Dr. Holbrook opined that Plaintiff had some limitations.  Plaintiff could only occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds.  Tr. 237.  Plaintiff could stand and/or walk for about 6 hours in an 8 hour workday and sit about 6 hours in an 8 hour workday.  Tr. 237.  Other than the limitations for lifting and carrying, Plaintiff had no limitations in his ability to push and/or pull.  Tr. 237.  Plaintiff was limited to only occasionally climbing ramps and stairs and never climbing ladders, ropes or scaffolds.  Tr. 238.  Dr. Holbrook opined that Plaintiff's allegations were not consistent with the medical evidence of record in the file.  Tr. 241.

### C.    Testimonial Evidence

### 1.    Park's Testimony

Park was represented by counsel and testified at the administrative hearing.  Tr. 40-46, 51-54, 57-58, 70.  In response to the ALJ's question "why do you think you are disabled," Park stated that he has two bulging discs, a bone spur, and some kind of nerve damage in his leg.  Tr. 42. He said that his back is really bad and it has been for 15 years – it just burns and goes down

---

[3] On May 16, 2008, Dr. Nick Albert, M.D., affirmed Dr. Holbrook's prior RFC.  Tr. 277.

his legs.  Tr. 42.  He concluded by stating "[a]nything I do it just really affects my lifestyle, you know, everything."  Tr. 42.

He can lift a 5 pound bag of sugar and a gallon of milk but is not sure whether or not he could lift and carry a 20 pound bag of potatoes.  Tr. 42.  He stated he has to constantly stretch or walk and he cannot sit or stand for long periods of time.  Tr. 42.  He can walk about a block and he reported walking two times each day and, during warmer weather, three times each day.  Tr. 43.  Walking a block takes him about 10 minutes.  Tr. 43.  He can only stand in one spot for a couple of minutes and can only sit for about 30 minutes.  Tr. 43.  He has not walked up steps in a very long time but also indicated that he does not have any steps.  Tr. 44.  He stated that he does not do very well stooping, crouching, squatting, kneeling or crawling.  Tr. 44.  He does stretching exercises on the ground to stretch his back about 10-20 times each day.  Tr. 43, 44.  He is better at bending all the way over at his waist rather than only bending slightly.  Tr. 44.  He has a difficult time raising his left arm because of cartilage build up.  Tr. 45.  Park indicated that, although he does not go very far, he drives and has not fallen asleep at the wheel or had any accidents.  Tr. 42, 57-58.

He reported receiving pain management treatment.  Tr. 44.   His doctors have not put him on any type of restrictions other than when he was working at Little Tykes. Tr. 44-45.  When at Little Tykes, he was placed on light duty work because he was operating a machine and his feet were falling asleep.  Tr. 44-45.

He stated that he is depressed because of his pain.  Tr. 45.  He has a young son and is unable to play with him because of his pain and he can no longer participate in the activities that he once was able to do such as playing basketball, baseball and football.  Tr. 45.  He also stated

that his mother had just passed away and he had just met his father for the first time.  Tr. 45-46.

He sees a psychiatrist at the pain management clinic.  Tr. 46.

He also stated that he suffers from chronic headaches but is unsure why he gets the

headaches.  Tr. 46.  He has high blood pressure.  Tr. 46.  During the Medical Expert's testimony,

Park reviewed the medications that had been prescribed and/or that he was taking.  Tr. 51-54.

### 2. Medical Expert's Testimony

Medical Expert Dr. Donald Junglas, M.D., ("Dr.  Junglas") testified at the hearing.  Tr.

47-51, 54-62.  Dr. Junglas is board certified in internal medicine and has been practicing internal

medicine for 42 years.  Tr. 47.  Dr. Junglas reviewed and summarized Park's medical evidence.

Tr. 47, 48.  Dr. Junglas indicated that he did not believe that Park had an impairment that, by

itself or in combination with other impairments, met or medically equaled the criteria for a

Listing.  Tr. 49-50, 61-62.

Regarding Park's functional capacity, Dr. Junglas opined that Park would be able to

occasionally lift or carry 20 pounds and should probably be able to lift 10 pounds frequently; he

should be able to walk less than 2 hours in an 8 hour workday but he should be able to sit at least

6 hours with a sit/stand option at will; he would be able to push and pull; he should not climb or

balance; he can bend at the waist; he should probably not crouch or crawl; he is able to use his

upper extremities, except he is unable to raise his arm away from his body; his vision is good; he

is able to communicate; he would not need environmental restrictions; and he should not work

on an assembly line or do piece rate work.[4]  Tr. 50, 59, 60.

Dr. Junglas noted the EMG/NCT that had been conducted and noted that it showed a

chronic left L5-S1 lesion.  Tr. 51. Dr. Junglas indicated that such a condition would potentially

---

[4] Dr. Junglas recognized Park's impairments of depression and anxiety as severe but could not give an opinion as to
Park's functional capacity relative to those impairments.  Tr. 58.

cause Park's chronic pain but he also noted that a nerve conduction test does not evaluate the level of pain.  Tr. 51.

In response to the ALJ's questioning, Dr. Junglas indicated that he did not see any reason why someone with the RFC limitations he found would be required to take any time off above and beyond normal breaks.  Tr. 55.  However, following Park's testimony regarding the type of medication he was taking, including pain medication (Tr. 51-54),[5] Dr. Junglas indicated that the medications that Park was taking will probably slow his thought processes so it is possible that Park would need to take more breaks than the average employee and that the breaks would be unpredictable (Tr. 56).  Dr. Junglas further indicated that it would be difficult for someone with the RFC limitations he noted and who would require unpredictable breaks to complete work 8 hours a day, 5 days a week, on a continuing sustained basis.  Tr. 56-57.

Dr. Junglas stated that he did not find any references to malingering or faking in the record.  Tr. 62.  He found that Park's medications were consistent with his medical condition and although he could not measure pain except by what Park says, he did not find Park's complaints to be inconsistent with his records.  Tr. 62.

### 3.    Vocational Expert's Testimony

Vocational Expert Deborah Lee ("VE") testified at the hearing.  Tr. 63-77.   The VE testified regarding the skill and exertional levels of Park's past work.  Tr. 63-65.  She stated that: his injection molding machine work was a medium skilled position and Park performed it at the medium level; his work in labor and heavy equipment operation (power shovel operator) was a medium/heavy skilled position but Park performed it at the heavy level; his work installing heavy glass was a medium skilled position but Park performed it at semi-skilled heavy level

---

[5] After Park testified to the various medications that were prescribed or that he was taking, he indicated that he was not currently taking the narcotic pain medication but that he had been taking one every 12 hours.  Tr. 54.

work; and his work operating a front end loader was a medium semi-skilled position but Park performed it at a light level.  Tr. 63-65.

The ALJ asked the VE to assume a hypothetical individual with the same age, education and work experience as Park with the ability to lift and carry up to no more than 20 pounds occasionally and 10 pounds frequently, stand and/or walk up to and no more than a total of 2 hours per 8 hour workday, and sit up to and no more than a total of 6 hours per 8 hour workday; requiring a sit/stand option but without the need to cease working more than a few seconds when exercising the option; inability to raise his upper left extremity away from his body at the side; inability to climb steps or ramps more than occasionally; ability to bend, stoop, crouch, squat, kneel and crawl no more than occasionally; inability to balance; limited to low stress work only; no assembly line work or piece rate work; no high or strict production quotas; no negotiation, arbitration, confrontation or other intense interpersonal interactions with the public, co-workers, or supervisors; no supervising or managing of other people and no being responsible for the health, safety or welfare of other people.  Tr. 65-68.

The VE indicated that such an individual would be unable to perform Plaintiff's past relevant work.  Tr. 69.  However, the VE testified that there would be jobs available in the regional or national economy that such an individual could perform, including cashier II, a light unskilled job (SVP 2); amusement and recreation attendant,[6] a light semi-skilled job (SVP 3); and counter and rental clerk, a light semi-skilled job (SVP 4).[7]  Tr. 69-72.  For the cashier II job, the VE noted that she would limit the cashier positions to locations such as parking garages,

[6] The VE gave the job of desk clerk at a bowling alley as an example of an amusement and recreation attendant.  Tr. 70.

[7] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).  Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

movie theaters, cafeterias and amusement parks and estimated those types of locations would correlate to about 6% of the cashiering base or 2,800 in northeast Ohio, 8,400-8,500 in Ohio and 200,700 nationally.  Tr. 69-70.  The ALJ noted that, because of the limitation on standing and walking, Park was in essence limited to sedentary work.  Tr. 69, 70.  In response, the VE indicated that many of attendant jobs can be performed with a sit/stand option, and she also provided the ALJ with her opinion as to what percentage of the base numbers would be available after taking into account the limitations in the ALJ's hypothetical.  Tr. 70-72.  For the amusement and recreation attendant position, she stated that there is roughly 12% of the base available which corresponds to approximately 300 such jobs in northeast Ohio, 900 in Ohio, and 29,700 in the U.S. economy.  Tr. 70-71.  For the counter and rental clerk position, considering the fact that many of the counter and rental clerk positions would allow for a sit/stand option and being very conservative in her estimate, the VE estimated that about 25% of the base would be available, which corresponds to 200 such jobs in northeast Ohio, 3,750 in Ohio and 112,120 in the U.S. economy.  Tr. 30, 71-72.

Upon cross-examination by Plaintiff's counsel, the VE confirmed that she provided her opinion of the available number of jobs based on a sedentary exertional level.  Tr. 72-73.  Also, upon cross-examination, the VE indicated that her numbers were mostly from May of 2008 and some were from May of 2007.  Tr. 73.  She indicated that she did not yet have a database of numbers after May of 2008.  Tr. 73.  She did not think that the 2009 numbers had been released yet.  Tr. 73.

Plaintiff's counsel asked whether the stated jobs would be available to the hypothetical individual if that individual would also need breaks on an unpredictable basis, in addition to normal breaks, such that the individual would be off task at least 15% of the time.  Tr. 73-74.

14

The VE indicated that, because the jobs were not highly skilled jobs, the jobs would not be available to such an individual.  Tr. 74.   Plaintiff's counsel also asked whether the stated jobs would be available to the hypothetical individual if, when the individual exercised the sit/stand option, he or she would be off task for at least a minute or two rather than only for a few seconds.  Tr. 74.  The VE indicated that adding such a limitation could be problematic.  Tr. 74-75.  While the VE, upon questioning by Plaintiff's counsel, stated that every job has the potential for confrontation, she did not agree with Plaintiff's counsel that the limitation of "no negotiation, arbitration, confrontation or other intense interaction with the public" would preclude the stated jobs.  Tr. 75-76.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his June 3, 2011, decision, the ALJ made the following findings:

1.      Park met the insured status requirements on October 1, 2011, and continued to meet them through December 31, 2011.  Tr. 12.

2.      Park did not engage in substantial gainful activity or a trial work period from November 1, 2006, the alleged onset date, through the date of the ALJ's decision.  Tr. 12-13.

3.      Park had the following severe impairments: degenerative disc disease of the lumbar spine with nerve root lesion at L5-S1 and lumbrosacral radiculitis radiating down the legs; degenerative arthritis of the right sacroiliac joint; degenerative arthritis of the left shoulder; anxiety; and

depression.  Tr.  13-15. Park's other impairments of his knees, fingers, left elbow, hypertension, gastroesophageal reflux disease, psoriasis, headaches and alleged alcohol abuse were considered but found to be non-severe.  Tr. 14-15.

4.      Park did not have an impairment or combination of impairments that met or equaled a Listing.[8]  Tr. 15-20.

5.      Park has the following RFC: he can lift and carry up to no more than 20 pounds occasionally and 10 pounds frequently; he can stand and/or walk up to and no more than a total, in the aggregate, of 2 hours per 8-hour workday; he can sit up to and no more than a total, in the aggregate, of 6 hours per 8-hour workday; he has to have a sit/stand option but does not need to cease working more than a few seconds at a time while exercising the sit/stand option; he cannot raise his upper left extremity away from his body to the side; he cannot climb ladders, ropes or scaffolds; he can climb steps and ramps up to and no more than occasionally; he can bend, stoop, crouch, squat, kneel, and crawl up to and no more than occasionally; he cannot balance; he can do low stress work only; he cannot do work involving high production quotas; he cannot do assembly line work or piece rate work; he cannot do work involving negotiation, confrontation, arbitration or other intense interpersonal interactions with the public, coworkers or supervisors; he cannot supervise or manage other people; and he cannot do work involving him being responsible for the health, safety and welfare of others.  Tr. 20-26.

6.      Park is unable to perform his past relevant work.  Tr. 26-28.

7.      Park was born on May 18, 1967, and at all times from November 1, 2006, through the date of the ALJ's decision, Park was a younger individual age 18-44.   Tr.  28.   He is a high school graduate and is able to communicate in English.  Tr. 28-29.   He completed heavy equipment school.  Tr. 29.

8.      Park's acquired job skills are not transferable to any job that Park's could do in accordance with the RFC.  Tr. 29.

9.      Based on Park's age, education, work experience and RFC, there are jobs that exist in significant numbers in the regional and/or national economy

---

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

that Park can perform including cashier II, amusement and recreation attendant, and counter and rental clerk.  Tr. 29-31.[9]

Based on the foregoing, the ALJ determined that Park had not been under a disability from November 1, 2006, through the date of the ALJ's decision.  Tr. 31-32.

## V. Parties' Arguments

### A.  Plaintiff's Arguments

Park argues that the ALJ improperly rejected and gave inadequate reasons for rejecting portions of the medical opinion of medical expert Dr. Donald Junglas, M.D., given at the hearing.  Doc. 14, pp. 11-15.  The focus of this argument relates to the ALJ's rejection of Dr. Junglas' opinion that it is possible that the Plaintiff would need to take more breaks than the average employee and his opinion that Plaintiff would have a difficult time sustaining work.  Doc. 14, pp. 11-12.

Related to his arguments regarding the ALJ's treatment of Dr. Junglas' opinions, Park also argues that the ALJ erred by failing to incorporate certain limitations into the RFC and VE hypothetical.  Doc. 14, pp. 15-16.  Although not entirely clear, it appears that the Plaintiff is arguing that the ALJ should have incorporated a limitation that Plaintiff would be off task 15% of the time.  Doc. 14, pp. 15-16.

Finally, although the Plaintiff agrees that it was acceptable for the ALJ to account for the economic downtown by reducing the VE's 2007 and 2008 jobs numbers, he asserts that the ALJ erred by arbitrarily choosing the percentage by which the numbers should be reduced. Doc. 14, pp. 16-17.

---

[9] The ALJ reduced the number of available jobs cited by the VE by 10% "to allow for the economic downturn."  Tr. 30-31.

**B.**     **Defendant's Arguments**

The Commissioner argues that the ALJ properly evaluated Dr. Junglas' opinion and Dr. Junglas' opinion that Plaintiff had disabling limitations was not supported by the record.  Doc. 15, pp. 9-11.

The Commissioner also argues that the ALJ's VE hypothetical included all of Plaintiff's limitations supported by the evidence and that the ALJ reasonably concluded that there are a significant number of jobs in the regional and national economy that Plaintiff could do.  Doc. 15, pp.  11-14.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**     **The ALJ properly considered the Medical Expert's opinion and provided adequate reasons for his treatment of the Medical Expert's opinion.**

Plaintiff takes issue with the ALJ's rejection of Dr. Junglas' opinion that it is possible that Park would require more breaks than the average employee (Doc. 14, pp. 11-14) and that Plaintiff's ability to sustain work "would be quite difficult" (Doc. 14, pp. 14-15 (citing to Tr. 56).

He also argues that the ALJ failed to clearly articulate his reasons underlying the weight provided to Dr. Junglas' opinion.  Doc. 14, pp. 12-14.

Plaintiff does not assert that Dr. Junglas was a treating physician entitled to controlling weight.  To support his arguments regarding Dr. Junglas, a non-treating physician,[10] he nonetheless relies upon cases applying the treating physician rule.  Doc. 12, pp. 12-13 (citing *Nickels v. Astrue*, No. 5:07-cv-1542, *17 (N.D. Ohio February 29, 2008), *report and recommendation adopted*, (N.D. Ohio May 13, 2008) and *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004)).

As demonstrated below, the ALJ did consider and evaluate Dr. Junglas' opinion in accordance with the Regulations notwithstanding the fact that he was not a treating physician.

1. *Dr. Junglas' opinion that it is possible that Park would require more breaks than an average employee.*

The ALJ did consider Dr. Junglas' opinion that "it's *possible* he [Park] would need to take more breaks than the average employee" because his medications might affect his thought processes.  Tr. 25, (Tr. 56 emphasis supplied).  Further, the ALJ explained the weight provided to that opinion.  Tr. 25-26.

Having considered Dr. Junglas' opinion, the ALJ concluded that the weight of the evidence and the testimony persuaded him that "Mr. Park would not need to take more than the usual number and length of rest periods at work if the work met all of the residual functional capacity requirements stated above in the first paragraph of this Finding #5."  Tr. 25-26. Plaintiff takes issue with this explanation and states that it is insufficient boilerplate.  Doc. 14, p. 12.  However, a review of the ALJ's decision shows that the ALJ engaged in a lengthy

---

[10] As a one-time examining physician, Dr. Junglas did not have an ongoing treatment relationship with Park and therefore his opinion is not entitled to controlling weight as the opinion of a treating physician would be.  *See Daniels v. Comm'r of Soc. Sec.*, 152 F. Appx. 485, 490 (6th Cir. 2005).

consideration of the evidence, including the treatment notes regarding side effects of Park's medications.  Tr. 24.  In particular, the ALJ indicates that "[i]n most of the treatment notes . . . nothing was said about Mr. Park suffering from side effects from medications" and "[i]n the minority of cases when Mr. Park did allege side effects from medications, his treating sources either quickly changed the dosage or the medication, thereby resolving the problem."  Tr. 24.  Also, the ALJ considered that when Park reported having nausea for 5 months from Oxycodone, he also reported that, after vomiting, he took more of the medicine that had just made him sick because he was not sure how much medicine he had taken.  Tr. 24, 382.  When asked why he would continue to take the same medicine that had just made him sick, he could not provide an answer.  Tr. 24, 382.   The ALJ specifically noted that Park's attempts to resume work were not unsuccessful because of an inability to concentrate on the job.  Tr. 24.  Rather, the ALJ indicated that the evidence persuaded him that Park's attempts were unsuccessful because the jobs he attempted required him to engage in exertional and postural activities greater than those allowed by the RFC.  Tr. 24.  The ALJ also noted that Plaintiff is able to drive and does so, locally, at least every other day.  Tr. 25.

While these findings are not contained in the sentence indicating that no weight was provided to Dr. Junglas' opinion regarding the number of breaks that might be required, the ALJ clearly analyzed the evidence concerning Plaintiff's actual reports of side effects from the medication and the treatment recommendations regarding those side effects.  Tr. 24.  Moreover, the ALJ's thorough decision provides the undersigned with sufficient ability to review the decision to determine whether the ALJ's decision is supported by substantial evidence.  Having conducted that review, the undersigned concludes that the ALJ's findings regarding Plaintiff's actual side effects from the medications and how his physicians responded to those side effects,

21

and his findings that it was not an inability to focus or concentrate that prevented Park from resuming work, are supported by the evidence. Tr. 202-203, 205, 295, 384, 366, 386, 387, 391. Thus, the ALJ's decision not to provide weight to Dr. Junglas' opinion that it was *possible* Park might require to take more breaks than the average employee was not error.

Plaintiff cites to a list of medications that Plaintiff either took or had been prescribed. Doc. 14, pp. 13-14. However, Plaintiff's list of medications does not, by itself, demonstrate that Plaintiff actually suffered side effects requiring a limitation in the RFC for unpredictable breaks. Additionally, even if Plaintiff could show that there is evidence to support his position, because the undersigned has determined that there is substantial evidence to support the ALJ's findings relative to Dr. Junglas' opinion, reversal is not warranted. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned).

Finally, the undersigned notes that Dr. Junglas stated only that it was *possible* that Park would need more breaks than the average employee. Tr. 56 (emphasis supplied). By limiting the Plaintiff to work involving no high production quotas, assembly line work or piece-rate work (Tr. 20) the ALJ sufficiently accounted for the *possibility* that more breaks would be required.

2.  *Dr. Junglas' opinion that Park would have difficulty sustaining work*

An opinion as to the ability to work or not work is an opinion on an issue reserved to the Commissioner.   20 C.F.R. § 404.1527(d)(1)-(3).  While such an opinion may not be disregarded, neither should it be given special significance.  20 C.F.R. § 404.1527(d)(1)-(3); Social Security Ruling No. 96-5p, 1996 SSR LEXIS 2, * 14-15 (July 2, 1996).   It is the Commissioner who is responsible for determining whether an individual is disabled, not a physician.  20 C.F.R. §

404.1527(d)(1).  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id.*

Since Dr. Junglas' opinion regarding Plaintiff's ability to sustain work on a full-time basis is in essence a statement that Plaintiff is unable to work full-time, special significance was not warranted.  Furthermore, in accordance with the Regulations, the ALJ did not disregard Dr. Junglas' opinion that it would be difficult for Park to work full-time on a sustained basis.  Tr. 25. Rather, the ALJ considered it but reached an opposite conclusion, i.e., the ALJ determined that Plaintiff could perform work if the work met the RFC limitations set forth in the ALJ's decision. Tr. 25-26.  Accordingly, the undersigned finds that the ALJ properly regarded Dr. Junglas' opinion regarding Park's ability, or lack thereof, to sustain full-time employment.

**B.**     **The ALJ's hypothetical to the VE and the ALJ's reliance upon the VE's response to that hypothetical was proper and supported by substantial evidence.**

Park relies upon the VE's response to a hypothetical question posed by his counsel that included a limitation that the individual would be off task more than 15% of the time.  Doc. 14, pp. 16-17.  The ALJ considered this limitation but did not adopt the limitation because he found there was insufficient evidence to support such a limitation.  Tr. 20-21, 26.

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence in your case record."  20 C.F.R. § 404.1545(a); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  "Hypothetical questions . . .  need only incorporate those limitations which the ALJ

has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)

(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

As is clear from a review of the decision, the ALJ thoroughly considered all relevant

evidence.  In doing so, the ALJ concluded that the evidence was insufficient to warrant a

limitation of being off task 15% of the time.  Tr. 26.  Therefore, the ALJ did not include that

limitation in the RFC.  Tr. 20-21.  As indicated in the preceding section, the ALJ's treatment of

and consideration of Dr. Junglas' opinion was proper and is supported by substantial evidence.

Accordingly, since the ALJ's RFC, which is substantially similar to the hypothetical that the ALJ

relied upon, is based on substantial evidence, Park's argument that it was improper for the ALJ

to rely on the VE's testimony in support of his conclusions is without merit.

**C.**      **The ALJ's decision to account for the economic downturn by applying a 10% reduction to the VE's jobs numbers was not improper and is not a basis for reversal or remand.**

As part of his Step 5 analysis, the ALJ noted that VE's job numbers were based on May

2007 and May 2008 numbers.  Tr. 30, 73.  The hearing was conducted on April 12, 2010 (Tr.

37), and the VE indicated that she did not yet have a database of numbers after May 2008 (Tr.

73).  Accordingly, to account for the economic downturn, the ALJ reduced the number of

available jobs cited by the VE by 10%.  Tr. 30-31.  The Plaintiff does not argue that the number

of jobs cited by the VE does not constitute a significant number or jobs or that, when reduced by

10%, the number does not constitute a significant number of jobs, nor does he take issue with the

ALJ factoring in the economic downturn.  Rather, Plaintiff argues that the ALJ erred because he

arbitrarily chose 10% as the appropriate amount by which to reduce the VE's numbers.  Doc. 14,

pp. 16-18.

Neither Plaintiff nor Defendant has provided authority on the specific issue of whether consideration may be given to an economic downturn and, if given, the proper method for doing so.  However, the Court has located a recent Northern District of Illinois case which is somewhat instructive on this issue.  In *Hunt v. Astrue*, when addressing the claimant's argument that the VE, during a 2009 hearing, relied upon 2007 job reports, the court noted that there was no suggestion that the VE had more recent data available at the time of the hearing.  2012 U.S. Dist. LEXIS 51280, * 36-37 (N.D. Ill. March 26, 2012).  Further, even though the VE testified that job numbers generally do not change much from year to year, the court proceeded to take judicial notice of the significant decline in the economy beginning in 2008.  *Id.*  In so doing, the court did not reduce the numbers by a particular percentage but rather reviewed the VE's testimony concerning the available number of jobs and ultimately concluded that, even considering the economic decline, there was substantial evidence to uphold the ALJ's decision that there were a significant number of jobs available to the claimant.  *Id.*

Here, Plaintiff has failed to present evidence, or even suggest, that more reliable data was available to the VE at the time of the hearing and, has failed to submit authority establishing that an ALJ must give consideration to changes in the national economy or must use a certain percentage or method for determining what percentage of reduction is required.  Thus, Plaintiff has failed to convince the undersigned that a remand is required for further development of this issue.  Moreover, the undersigned concludes that the ALJ's decision that a significant number of jobs remain available to Park is supported by substantial evidence.[11]

---

[11] The final numbers relied upon by the ALJ are as follows: approximately 2,970 in northeast Ohio, approximately 11,745 in Ohio, and approximately 326, 313 in the U.S. economy.  Tr. 31.

### VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

Dated:  January 15, 2013

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).